Statement of the Case.
NICHOLES, J.
Plaintiff averred that he married defendant on the 15th of December, 1903; that the sole issue of the marriage was a girl at the time of bringing suit, 5 months and 22 days old; that he had always conducted himself properly, had given his wife no cause or provocation for ill treatment, and had done everything in his power to make his wife happy and comfortable; that on the 20th of February, 1904, his wife abandoned him and had never since returned to him; that, at the time of said abandonment, petitioner was living in Versailles,. in St. Bernard parish, where petitioner had provided a home (comfortable) for his wife; that his wife still continues to remain away from him; that her abandonment is inconsistent with her duty; and that under the circumstances he desired to obtain a decree of separation from bed and board from his wife.
In view of the premises, petitioner prayed that his wife be duly cited to appear and answer the petition; that she be notified and summoned in the manner pointed out by law to return to the matrimonial domicile; and that in due course petitioner have judgment in his favor decreeing a separation “a mensa et thoro” from his wife and for general relief. Defendant was duly cited, and also-summoned to return to the domicile, or show cause why she. neglected to do so.
On November 9, 1905, on motion of plaintiff’s attorneys, and on their suggesting that three reiterated summonses had been issued in the cause from month to month directing the defendant to return to the matrimonial domicile, according to law, and that all the legal delays had expired, and she had not complied with said summons, the court ordered that there be judgment sentencing the defendant to comply with said summons, and that said judgment be notified to the defendant three times, successively from month to month according to law.
A notice of this judgment was served upon the defendant on the 22d day of November, 1905, identical with the summons originally-given and calling on her to show cause why she should not comply. On the 20th of December, 1905, the defendant answered, pleading, first, the general issue admitting her marriage with plaintiff and the birth of the child, issue of the same. Further answering, she averred that at the time of her marriage she resided with her father in the city of *699 New Orleans, and that to comply with her husband’s wishes she consented to establish their marital domicile at the latter’s mother’s in the parish of- St. Bernard; that she had always demeaned herself as a good, true, and ■dutiful wife, and had never abandoned her husband; that her husband had neglected to provide her with the necessaries of life and had been guilty of harsh and cruel treatment towards her; that during their residence at the house of her mother-in-law, he (her husband) allowed his mother to insult, abuse, ill-treat, assault, and beat respondent; that the conduct of respondent’s mother-in-law was violent and brutal culminating in the -assault and beating of respondent and the casting her out of the house; that he (her husband) himself brought her to her father’s house, where it was intended she should remain until he could provide a residence for her. Respondent averred that her husband had never provided for her and her child, or in any manner provided for their wants, except through compulsion under order of court.
She averred that during the month of March, 1904, ■ respondent’s husband instituted •suit against her praying for a separation from bed and board, being suit No-. 72,765 of the docket of the civil district court for the parish of Orleans; that respondent joined issue in said suit, and the same was tried and taken under advisement by the court; that pending these proceedings respondent consented to return to plaintiff upon his assurance of better ^ and more considerate treatment and his promise to provide a home for her and her child.
That since her voluntary return to her husband, he, unmindful of all his pledges and assurances of his duties towards respondent, had been guilty of the most cruel neglect of respondent and his child, and had neglected to provide for them' any of the comforts or necessaries of life, even of a bed, they being forced to lie upon the bare floor; that he had been guilty of cruel treatment, insults, abuse, and assaulting her violently with a stick and threatening to break her back, and putting her out of the house and telling her that he would do to her as he had done to his first wife, that is, to make her so miserable that she would sue him for a divorce, for he had no use for her, which statements he had made to other persons, as would be shown on the trial of this cause.
In view of the premises respondent prayed that plaintiff’s suit be dismissed, with costs.
Subsequent to this a second and third notice of the second preliminary judgment was served on the defendant; the second being served on the 2d day of December, 1965. and the third on the 5th of February, 1906. On the 5th of April, 1906, the court rendered judgment dismissing plaintiff’s suit, and he has appealed.
Opinion.
Plaintiff urges (but only in argument) that, his wife having been summoned three times to return to the matrimonial domicile, or show cause, if any she had, why she should not do so, it was her duty on or before the day fixed-for so doing in the summons to have appeared and assigned the grounds, if any she had, why she should not do so. That, having neglected to so show cause, a preliminary judgment was rendered by the court, commanding her absolutely and peremptorily to return. That the effect of this judgment was to close the door against her assigning thereafter any grounds for her refusal to return, and that, from the date of that judgment, the only alternative left her was either to return, as ordered, or to submit to a judgment of separation. We think, even if this contention would have had any merit, that the course pursued by the plaintiff has cut him off from advancing it at the time and in the manner he has. If he believed t¿at the preliminary judgment rendered would have the force and effect which he now maintains it *701 Fas, he should have taken, a default against the defendant before having that judgment tendered. So far from doing so, he permitted -without objection the defendant to file an answer, to have the case fixed for' trial, and to go to trial on the merits upon the issues .raised by the answer on evidence adduced. It is too late for himi to set up such an objection after judgment against him. Article 145 of the Civil Code does not prescribe the form of the summons to be served upon the defendant. That adopted by the ■clerk of the district court by which the wife was called upon to show cause, if any she had, why she should not return, was the act of the clerk, and not the mandate of the Jaw. The law itself called for what may be designated a “flat” summons to return.
Turning to the merits of the case, we think that the testimony adduced by the defendant as a whole- fully warranted the judgment of ■the district court, though some portions of it ■were inconclusive and not satisfactory.
The wife did not desert the matrimonial ■domicile. She (with her baby in her arms) was ejected from it by her husband. The ■circumstances under which she left are thus testified to by Mr. Dupont, who was a visitor- at the house at the time:
“Q. Please explain to the court what took place while you were there. Was there any discussion that you know of between Mr. Baurens and his wife?
“A. Tes, sir.
“Q. What was the discussion?
“A. Well, Mrs. Baurens came to Mr. Baurens .and asked his permission to go and visit her ■mother, and he got up very wild and mad and ordered her out, and led her to the door.
“Q. What else took place?
“A. He then turned to his father-in-law and ■said: ‘You old hypocrite! Get out of this house!’
“Q. .Was anything else said that you know?
“A. Nothing else, except Mr. Baurens said he was going off and get something, and he then ran from his place to another place further up.
“Q. You don’t know whose place that was he ran to?
“A. No, sir; I could not say. He went out through the hack door and went off through the field there.
“Q. Do you know what he was going to get?
“A. No, sir ; I could not say, but I thought it was time to take to the road.
“Q. Did he make any threats to his wife?
“A. He told his wife never to put her foot back in there; that if she did he would break her neck with a stick of wood.
“Q. You heard him say that?
“A. Yes, sir.
“Q. You are positive of that?
“A. I am positive.
“Q. What took place then?
“A. There was nothing said after that.
“Q. Did you leave then?
“A. I left.
“Q. Did he speak loud when he said that to his wife? Was he angry?
“A. He was very angry and wild.
“Q. Was that what brought on the discussion, simply because his wife asked him to go and see her mother?
“A. That was just it.
“Q. Prior to that had he been nice to you all?
“A. Very nice. He treated me nice when I walked into his house. When his wife asked him that permission, he went off wild.
“Q. Did you hear his wife say she was afraid to stay there by herself?
“A. No, she didn’t say anything. She said: ‘John, you put me out of the house.’ 1-Ie kept following her until she got to the door.
“Q. Did she have the baby then?
“A. Yes, sir; she had the baby in her arms.”
On cross-examination the following questions were asked and answered:
“Q. Now, what was the first thing that was said, and who said it, to bring about any disturbance between the people?
“A. Well, Mr. Baurens started the disturbance first.
"Q. What caused him to start it? •
“A. Well, his wife just asked him that she wanted to go and visit her mother; that her mother was sick, and he could come and get her in the afternoon, and he got up and got mad.
“Q. What time was that?
“A. In the morning between 11 and 12 o’clock.
“Q. Well, then, what did he say?
“A. He ordered her out. I-Ie told her to get out.
“Q. I want to know what was the first thing he said to her?
“A. He said: ‘To hell with your mother! God damn your mother!’ That is what he said..
“Q. He objected to her going to see her mother?
“A. He told her she could get out, to hell with her mother, and that if she ever came back he would break her back with a stick.
“Q. I am asking you if she asked his permission to go home?
*703 “A. Yes, sir; and he objected to it in his wild way.
“Q. He has rather an impulsive way, has he not?
“A. Yes, sir.
“Q. That is his way of talking?
“A. I don’t know.
“Q. That is his nature?
“A. I don’t know.
“Q. You just said so?
“A. I don’t know.
“Q. She asked him if she could go home to visit her mother?
“A. Yes, sir; and he said what I told you: ‘To hell with your mother! God damn your mother!’ He cursed her and ran her out.
“Q. You say he cursed her and ran her out. How do you mean ‘ran her out’?
“A. 1-Iis brutish ways. She ran out in the street.
“Q. She ran out in the street?
“A. She ran out in the road.”
Under the circumstances that the wife left the husband, he could not expect (no-r did he expect) that his wife would return'to the matrimonial domicile.
We are satisfied from the testimony, after examination, that it was not his wish or expectation that she should return. On the contrary, he fully expected and relied upon her remaining away. We are satisfied that the present suit was not brought in good faith and for the purpose of bringing about a resumption of the relations between the spouses. It was evidently instituted with the object of obtaining by reason of a refusal on her part to return, a judgment of separation from bed and board to be followed up later (by reason of want of reconciliation) by a judgment of absolute divorce. Should he be successful in the plan which-he has obviously mapped out, he will have indicated to husbands disposed to put an end to their self-imposed matrimonial obligations an easy and convenient, and we may say an iniquitous, method of doing so.
Neither the laws of the state nor the courts of the state can be utilized to accomplish any such purpose.
The judgment appealed from is affirmed.